El Pueblo de Puerto Rico, demandante y apelado, v.
Valentín Lebrón Ortiz, acusado y apelante.

Núm. 7961.—*Sometido:* Abril 15, 1940. *Resuelto:* Abril 26, 1940.

*Alfonso Lastra Chárriez* y *A. D. Marchand Paz,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Travieso emitió la opinión del tribunal.

El acusado apelante fué convicto de un delito de homicidio voluntario y condenado a la pena de cuatro años de presidio con trabajos forzados. Para sostener el presente recurso alega que la corte inferior erró:

(1) Al negarse a permitir al acusado en el inicio de la vista la presentación de prueba justificativa de la procedencia de la suspensión de la vista.

(2) Al negarse a trasmitir cierta instrucción solicitada por la defensa.

- ▬▬ El incidente a que se refiere el primer señalamiento, tal como aparece del récord, es el siguiente:

El 26 de septiembre de 1936 tuvo lugar el acto del *arraignment*. Compareció el acusado en persona y asistido de su abogado. Según consta de las minutas de la corte, "leída la acusación entregándosele copia de la misma al acusado alegó ser inocente y solicitó juicio por jurado." De acuerdo con las notas tomadas por el taquígrafo en esa misma fecha, las que fueron ofrecidas por el fiscal como prueba de *rebuttal,* en el acto de serle leída la acusación el acusado fué sometido a un interrogatorio, contestando sin dificultad alguna, en la forma siguiente:

"¿Cómo se llama? Valentín Lebrón. ¿Usted es soltero? Sí, señor. ¿Cómo se llama? Valentín Lebrón. ¿Su segundo apellido? Ortiz. ¿Cuál es el otro apellido? Lebrón. ¿Ortiz, usted no es Ortiz? Ortiz. ¿Lebrón Ortiz? Sí, señor. ¿Cuántos años tiene? Cuarenta. ¿Soltero o casado? Soltero. ¿Dónde vive? En Yabucoa. ¿En qué trabaja? Plomería."

Al ser llamado el caso para juicio, el 24 de octubre de 1938, la defensa solicitó la suspensión de la vista, alegando:

"Sr. Juez, hay una situación que yo desconocía en este caso y es que . . . ahora cuando me enfrento con el acusado es un hombre sordo como una tapia y tampoco puede ver bien, y resulta que él no me ha podido entender todavía, yo desafío a un ser humano que pueda hacerse entender con este señor, con el acusado. Es un hombre que no le entra ningún ruido por ninguno de los oídos que él posee."

El juez resolvió constituir primero el jurado y declarar un receso por todo el tiempo necesario para que el abogado pudiese hablar y entenderse con su defendido. El abogado manifestó entonces que ésa era la primera vez que había hablado con el acusado. Más adelante solicitó la suspensión por el motivo de que siendo sordo el acusado su abogado no podía hablar con él sin que se enterasen otras personas.

Constituído el jurado, se dió lectura a la acusación, que consta de unas setenta y cinco palabras. Preguntó el juez qué alegación hacía el acusado, y entonces ocurrió lo que sigue, copiado de la transcripción de evidencia:

"P. Con la venia de la corte (dirigiéndose al acusado) ¿Usted ha oído lo que dice ese documento que han leído ahora?

"R. ¿Ah?

"P. ¿Usted ha oído el documento que le han leído a usted?

"R. ¿Que si lo oí?

"P. Sí.

"R. No lo he oído.

"Juez: Dice: 'Lo he leído.'

"Defensor.

"P. ¿Usted puede leer eso?

"R. No contesta.

"P. ¿Usted puede leer eso?

"R. No contesta.

"P. Que si usted puede leer lo que dice ahí.

"R. No lo he oído leer.

"P. Que si lo puede leer.

"R. ¿Leerlo?

"P. Leer.

"R. Yo no veo.

"P. ¿Pero usted no tiene espejuelos?

"R. No tengo.

"P. ¿Dónde están sus espejuelos, usted usa espejuelos para leer?

"R. Yo no uso.

"P. ¿Pero usted sabe leer?

"R. Sí, un poco.

"P. Pues lea eso.

"R. Es que no veo eso en letras, no veo eso de arriba más grande, no lo veo.

"Juez.

"P. Dice que lo de arriba no lo ve, mire a ver si ve lo de abajo.

"R. No puedo verla, si la viera la leía.

"Defensor.

"P. ¿Ah?

"R. Si la viera la leía.

"P. Tiene que leerla, mire a ver si puede, con la venia de la corte."

Del récord aparece que en diciembre 18 de 1936, teniendo que ausentarse para Europa, el abogado defensor solicitó la suspensión de la vista y alegó en su moción que el acusado le había conferido su representación, explicándole las circunstancias y pormenores de su causa y que "después de haber estudiado dicha causa, tiene el criterio que le asiste una buena, legítima y razonable causa de defensa."

Después de un largo diálogo entre el abogado defensor y la corte, ésta denegó la moción de suspensión e hizo anotar la alegación de inocencia del acusado. Preguntado el defensor si la defensa tenía testigos, respondió: "Tenemos testigos pero no sabemos lo que dicen"; "Ahora no estamos en condiciones de llamar la prueba; testigos tiene. Le puedo decir que tiene, que están ahí, que yo no sé lo que dicen y aunque lo supiera, hasta que no me pueda entender con este hombre no me será posible."

De la declaración del médico que examinó al acusado en la mañana del juicio resulta que el acusado es totalmente sordo del oído derecho y parcialmente sordo del izquierdo; que puede oír si se le grita lo suficiente o si él vigila la modulación del que le habla despacio; que es miope y puede ver bien a una distancia de ocho pulgadas.

¿Erró la corte inferior al negarse a suspender el juicio? A nuestro juicio procedió correctamente. Desde el 26 de septiembre, 1936, a 24 de octubre, 1938, transcurrieron dos años, tiempo más que suficiente para que el abogado defensor pudiese entrevistarse con su cliente, informarle de la naturaleza del cargo que se le hacía, conversar con sus testigos, enterarse de lo que éstos habrían de declarar y tomar cualesquiera medidas que fueren necesarias para la debida defensa del acusado.

No obstante la alegación de la defensa—contraria a la que se hiciera para conseguir la suspensión de la vista con motivo del viaje a Europa—de que el acusado por ser sordo no sabía de qué se le acusaba y no podía comunicarse con su abogado, el hecho es que el acusado tenía ante la corte al

comenzar el juicio todos los testigos que utilizó más tarde para tratar de sostener su teoría de defensa propia.

La corte inferior estuvo a nuestro juicio justificada al llegar a la conclusión de que la alegada sordera, que impedía al acusado oír la acusación cuando le fué leída, y la alegada miopía, que le impedía leerla al serle mostrada, no eran más que subterfugios para dilatar el procedimiento y posponer la acción de la justicia.

En el interrogatorio a que fué sometido en el acto del *arraignment,* el acusado no tuvo dificultad alguna para oír y contestar correctamente las once preguntas que se le hicieron. Debemos presumir que igualmente pudo oír la lectura de las setenta y cinco palabras de que consta la acusación.

El interrogatorio a que fué sometido en el acto del juicio, supra, es la mejor demostración de la variabilidad del grado de sordera del acusado de acuerdo con las circunstancias del momento en que se le habla. Cuando las preguntas tienden a investigar si él oye, el acusado contesta ¿Ah?, como si no hubiese oído, o se abstiene de contestar; pero a medida que avanza el interrogatorio y se entra en el campo de investigación de su facultad visual, el acusado empieza a oír mejor y sin dificultad alguna contesta las nueve o diez preguntas que se le hacen con el propósito de averiguar si él ve lo suficiente para poder leer la acusación. Entonces oye lo suficiente para negar que pueda ver y contesta "Yo no veo, no tengo espejuelos, yo no uso (espejuelos)"; y sigue contestando que él sabe leer un poco, que no ve las letras del papel que se le muestra, que si lo viera lo leería.

Aún cuando la defensa no ha levantado cuestión alguna en relación con la suficiencia de la prueba, hemos hecho un estudio detenido de la transcripción de evidencia y opinamos que el veredicto está ampliamente sostenido por la prueba.

■ En el segundo señalamiento se queja el apelante de la negativa de la corte a transmitir al jurado la siguiente instrucción:

"La prueba producida por el acusado tiende a establecer que éste dió muerte al interfecto en defensa propia dentro del propio hogar, circunstancia que hace la defensa propia menos rígida que en otros casos."

La corte hizo constar que la denegaba por entender que estaba comprendida en las instrucciones generales que ya había dado al jurado. Hemos leído dichas instrucciones y convenimos con la corte inferior en que la instrucción denegada estaba cubierta por las instrucciones generales. En ellas dijo la corte inferior:

"Además, parte de la teoría, Sres. del Jurado, de la defensa, tiende a demostrar que el acusado actuó en la defensa de su hogar. Con respecto a este extremo la corte va a dar instrucciones al jurado cuándo es que el homicidio es justificable."

Después de informar al jurado acerca de los casos en que el homicidio es justificable de acuerdo con los artículos 207, 208 y 209 del Código Penal, dijo la corte:

"Cuando se cometa al defender una morada, propiedad o persona contra alguno que manifiestamente intente o procure, por medio de violencia o sorpresa, cometer cualquier delito grave o que violenta, desordenada y tumultuosamente intente o procure penetrar en la morada de otro con el propósito de agredir a alguna persona que se hallare en ella.

"La persona que intente violenta, tumultuosa y desordenamente entrar en la morada de otra persona con intención de agredir a otra persona que esté ahí adentro, en esas circunstancias si el morador de la casa mata, el homicidio puede justificarse."

La evidencia de la defensa no sostuvo la teoría de que el acusado había dado muerte al interfecto en defensa de su hogar. La riña entre el acusado y su sobrino ocurrió dentro de la casa de María Lebrón Ortiz, en la cual vivía el acusado y la cual visitaba frecuentemente el interfecto como sobrino que era de los hermanos Lebrón.

*Debe confirmarse la sentencia recurrida.*